J-S50045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ARTHUR F. STOSS, SR. | |
| Appellant | No. 1869 MDA 2015 |

Appeal from the Order Entered September 14, 2015
In the Court of Common Pleas of Luzerne County
Criminal Division at No(s): CP-40-CR-0001540-2011

BEFORE: STABILE, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY SOLANO, J.: **FILED SEPTEMBER 08, 2016**

Appellant, Arthur F. Stoss, Sr., appeals from the order denying his timely petition filed pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546. We affirm.

The pertinent facts and procedural history have been summarized previously by this Court as follows:

> On March 11, 2011, the Pittston Police Department received information that there was a pool of blood located on a sidewalk a few feet from the Susquehanna River in Riverfront Park. While examining the area, the police discovered identification that belonged to Lillian Calabro and a broken slab covered with blood, which DNA testing subsequently linked to Ms. Calabro. After finding Ms. Calabro's belongings near the blood, the police attempted to locate her. They discovered that on the evening of March 11, 2011, [Ms. Calabro] was drinking at Stephanie's

---

[*] Former Justice specially assigned to the Superior Court.

J-S50045-16

Bar in the company of Larry Shannon, Susan Henry, and Appellant.

Jeniffer [*sic*] Milazzo, Appellant's daughter and a friend of Ms. Calabro, testified at trial. She reported that both [Ms. Calabro] and Appellant abused drugs. On the night of March 11, 2011, and early morning of March 12, 2011, Jeniffer was drinking in her residence with Karen Milazzo, who was Jeniffer's aunt, and Karen's daughter, Amanda Smith. Appellant telephoned Jeniffer at around 2:30 a.m. on March 12, 2011. Jeniffer related, "[W]hen I answered the phone, [Appellant] sounded out of breath and I said, 'Where are you?' And [Appellant] said, 'Jeniffer, I'm down at the river, I murdered a black man. It was a drug deal gone bad." N.T. Trial, 3/12/12, at 524. Jeniffer refused to believe Appellant as he had a long history of lying to her, and she demanded that Appellant come to her home.

When Appellant arrived at Jeniffer's apartment, "he was wet from the waist down, his jeans were soaking wet, and he had no shirt on," and he "had a long scratch going down his chest to his stomach." *Id.* at 524-25, 528. Appellant repeated his story that he had killed a man over a drug transaction, but none of the women present in Jeniffer's apartment believed him.

At trial, Ms. Smith confirmed that Appellant was wearing jeans, no shirt, boots, and a jacket when he reached Jeniffer's residence. After his arrival, Appellant said "that he might have killed somebody." *Id.* at 619. He claimed that he fought with a man over drugs and killed him by hitting him in the head with a rock. Ms. Smith observed scratches and a bruise on Appellant's body.

After she found out that blood was discovered in the park, Jeniffer came forward to Pittston Township police and told them about the events concerning her father. On March 12, 2011, police found Appellant at his brother's house and asked if they could question him about Ms. Calabro's disappearance. Appellant agreed to accompany them to the police barracks, where Luzerne County Detective James [Noon] questioned him in the presence of State Trooper Lisa Brogan. The two law enforcement officials identified themselves, indicated that they were

attempting to locate Ms. Calabro, and asked Appellant if he knew anything about her activities on the evening of March 11, 2012.

Appellant told the police the following. He was in the company of Ms. Calabro and Mr. Shannon at around 8:00 p.m. at Stephanie's bar, and they left the establishment shortly after 8:00 p.m. to go to Appellant's home, where they consumed cocaine. Appellant, Mr. Shannon, and Ms. Calabro thereafter went to Mr. Shannon's home and consumed beer. Ms. Calabro then said that she needed to locate more cocaine and arranged to purchase it from someone who would meet her outside. Appellant accompanied Ms. Calabro to purchase the drugs, and they proceeded to a parking lot near 13 William Street, Pittston City. When they arrived, Ms. Calabro entered a red Mitsubishi Eclipse being driven by a male. Appellant told the police officers that he had not seen Ms. Calabro since she entered the car with the unidentified man.

During the interview, Detective [Noon] noticed that Appellant had cuts on his right hand and forearm. After giving his statement, Appellant granted the police permission to obtain the boots, jeans, and coat that he was wearing on March 11, 2011, and allowed them to scrape his fingernails. The police then returned Appellant to his brother's home.

On March 22, 2011, Ms. Calabro's body was discovered in a thicket of branches and trees along the bank of the Susquehanna River. The autopsy performed by Dr. Gary Ross, a forensic pathologist, established that her death was caused by blunt force trauma to the left side of her head. Dr. Ross opined that there was massive injury to the upper portion of the head producing multiple fractures of the jaw, sinuses, and orbits. Dr. Ross also reported that [Ms. Calabro] had sustained numerous contusions and abrasions on the body surface and stated she had been strangled.

***Commonwealth v. Stoss***, No. 1374 MDA 2012, slip op. at 1-4 (Pa. Super.

Aug. 7, 2013).

Prior to trial, the trial court denied Appellant's motion to suppress the statements he made to police. During trial, the Commonwealth produced an eyewitness who had been at a Domino's Pizza shop near the events at issue at 11:23 p.m. (according to her store receipt) on March 11, 2011. She testified to seeing a man and a woman near the water's edge in what she believed to be an argument. At the conclusion of a five-day trial, a jury convicted Appellant of first-degree murder, and on June 12, 2012, the trial court sentenced him to life in prison. Appellant filed a timely appeal to this Court, and this Court affirmed his judgment of sentence. On January 21, 2014, the Supreme Court of Pennsylvania denied Appellant's petition for allowance of appeal. *Commonwealth v. Stoss*, 83 A.2d 415 (Pa. 2014).

Appellant filed a timely *pro se* PCRA petition on March 10, 2014. The PCRA court appointed counsel, and PCRA counsel filed a supplemental petition on November 13, 2014. The Commonwealth filed a response, and on April 21, 2015, the PCRA court held an evidentiary hearing. Appellant testified on his own behalf and presented testimony from his lawyer on his direct appeal and from his two trial attorneys. By order entered September 14, 2015, the PCRA court dismissed Appellant's PCRA petition.

PCRA counsel filed a timely appeal on Appellant's behalf. On October 19, 2015, Appellant filed a *pro se* "Petition for Waiver of Counsel and Surrender of Case Documents," in which he sought to waive his right to be

represented by PCRA counsel.[1]  Appellant also filed an application for similar relief with this Court, and PCRA counsel filed a petition to withdraw.  By order entered November 23, 2015, this Court remanded the case for a **Grazier**[2] hearing so that the trial court could conduct an on-the-record colloquy and determine whether Appellant's waiver of counsel was knowing, intelligent, and voluntary.

The PCRA court complied with this directive, and on December 18, 2015, entered an order stating that Appellant's waiver of counsel was valid, permitting PCRA counsel to withdraw, and appointing standby counsel for Appellant.

On appeal, Appellant raises the following issues in his *pro se* brief, as stated:

> A. Whether trial counsel was ineffective in failing to present an alibi defense that appellant was not the person with [Ms. Calabro] on the riverbank at 11:23 p.m.?
>
> B. Whether trial counsel was ineffective in failing to object to the prosecutor[']s statement in closing arguments that defendant's blood was on the presumed murder weapon [a concrete paver] when DNA test[s] were all negative for his presence on the presumed murder weapon or riverbank?

---

[1] Appellant also filed a *pro se* notice of appeal.  By *per curiam* order entered February 10, 2016, this Court dismissed the appeal as duplicative.

[2] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1988).

C. Whether trial counsel was ineffective in failing to present that a juvenile had confessed to killing someone down on the riverbank?

D. Whether PCRA counsel was ineffective in his failure to raise trial counsel['s] ineffectiveness for failing to raise and preserve, on direct appeal, the issue concerning the trial court[']s abuse of discretion in its ruling to limit appellant, (N.T. Trial, at 9-12), to only two precise days during the witnesses['] entire lives where he was [prohibited from] informing the jury concerning the witnesses['] questionable life style and characteristics related to reasons why they would altogether conspire to frame false testimony against [him]?

E. Whether PCRA counsel was ineffective for failing to raise trial counsel and direct appeal [counsel']s ineffectiveness for failing to raise the issue that under the totality of the circumstances there was insufficient evidence to support Appellant's conviction of first degree murder. Specifically, the evidence was insufficient to establish the identity of the perpetrator of the murder; therefore insufficient to prove beyond a reasonable doubt that appellant was, in fact, the alleged perpetrator of the crime of murder?

Appellant's Brief at 3-4. We will address these issues in the order presented.

Preliminarily, we recognize that in reviewing the propriety of an order granting or denying PCRA relief, this Court is limited to ascertaining whether the evidence supports the determination of the PCRA court and whether the ruling is free of legal error. *Commonwealth v. Payne*, 794 A.2d 902, 905 (Pa. Super. 2002). This Court defers to the findings of the PCRA court, which will not be disturbed unless they have no support in the certified record. *Id.* Furthermore, to be entitled to relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that the

conviction or sentence arose from one or more of the errors enumerated in Section 9543(a)(2) of the PCRA. One such error is an ineffective assistance of counsel that, "in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). Each of Appellant's five issues challenges the effectiveness of trial counsel under this provision.

To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Payne*, 794 A.2d at 905. This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. *Id.* at 905-06. A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any of these prongs. *Commonwealth v. Pierce*, 786 A.2d 203, 221-22 (Pa. 2001).

In this context, a finding of "prejudice" requires the petitioner to show "there is a reasonable probability that, but for the error of counsel, the outcome of the proceeding would have been different." *Commonwealth v. Stevens*, 739 A.2d 507, 512 (Pa. 1999). The law presumes that counsel was effective, and it is the petitioner's burden to prove the contrary.

*Payne*, 794 A.2d at 906. Counsel cannot be deemed ineffective for failing to pursue a meritless claim. *Id.*

Appellant first claims that both of his trial counsel were ineffective for failing to present an alibi defense at trial. "Generally, an alibi is a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him [or her] to be the guilty party. . . . At the core of an alibi defense is, of course, consistency between the date and time of the crime and that of the defendant's alibi." *Commonwealth v. Ali*, 10 A.3d 282, 316 (Pa. 2010) (internal citation omitted).

Appellant cites to video surveillance of him on security cameras from a business that was approximately an eight-minute walking distance from the riverbank. He asserts that the times on the video establish that he could not have been the person the Commonwealth's eyewitness saw "with the victim on the riverbank at 11:30 p.m." Appellant's Brief at 8. He further contends that, given this evidence, he "would have been entitled to an alibi instruction," and that such evidence could "have raised a reasonable doubt with the jury [] of [his] presence at the scene of the crime." *Id.*

At the PCRA court's evidentiary hearing, both attorneys who represented Appellant at trial testified that Appellant never asked to present an alibi and that their review of the discovery materials yielded no probable evidence of an alibi. *See* N.T., 4/21/15, at 55-90, 91-95.

Also, the PCRA court observed that, according to trial counsel, the amount of time that passed between when the Commonwealth witness first ordered her pizza at 11:23 p.m. and when the witness received the pizza is not definitively established in the record. Nor was Ms. Calabro's precise time of death ever established on the record, and Appellant's own statements to police, his daughter, and Amanda Smith, place him in the vicinity of the riverbank near midnight and into the early morning hours of the next day. As the PCRA court explained:

> [Jeniffer] relates seeing her father in the early morning hours on March 12, 2011 at her apartment. [She] testified [Appellant] called her around 2:30 a.m., and said he was at the river and he murdered a black man in a bad drug deal. When she saw her father, [Jeniffer] testified "he was wet from the waist down, jeans soaking wet, shirtless, with scratches down his chest." This testimony was corroborated by another witness, Amanda Smith. [Ms.] Smith also testified that [Appellant] said he was in a fight with a black man and killed him by hitting him in the head with a rock.
>
> Defense counsel, as indicated, tried to suppress [Appellant's] statements made to police on March 12, 2011[.] With their Motion denied, the statements came in and with no other location for [Appellant] and no corroboration there is no real alibi. There was no exact time of death and [Jeniffer] testified as to a phone call from her father around 2:30 a.m. The early morning hour would allow ample time for [Appellant] to commit the crime for which he was found guilty.

PCRA Court Opinion, 9/15/15, at 8 (citation to notes of testimony omitted).

Because our review of the record supports the PCRA court's conclusion, Appellant's first issue regarding ineffectiveness lacks arguable merit and is therefore denied.

Appellant next asserts trial counsel was ineffective for failing to object to the prosecutor's statement during closing arguments that Appellant's blood was found on "the paving piece that was allegedly used as the murder weapon." Appellant's Brief at 14. According to Appellant:

> This was clearly prosecutorial misconduct intentionally undertaken to prejudice [Appellant] to the point of the denial of a fair trial. The prosecutor knew that there was not a single item retrieved from the scene of the crime that had [Appellant's] DNA or blood. The blood on the paver was the victim[']s blood, not [Appellant's].

*Id.* at 15.

Our standard of review for a claim of prosecutorial misconduct is limited to "whether the trial court abused its discretion." *Commonwealth v. Harris*, 884 A.2d 920, 927 (Pa. Super. 2005), *appeal denied*, 928 A.2d 1289 (Pa. 2007). In considering such a claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. *Id.* This Court has observed:

> Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward Appellant so that they could not [weigh] the evidence objectively and render a true verdict. Prosecutorial misconduct, however, will not be found where the comments were based on

- 10 -

evidence or proper inferences therefrom or were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made.

*Id.*

Instantly, the PCRA court found no merit to Appellant's claim because the prosecutor immediately corrected himself. Additionally, the PCRA court stated that the trial court had instructed the jury, on several occasions, that closings by counsel are not evidence, and cited the point that juries are presumed to follow the trial court's instructions. The PCRA court explained:

> It is undisputed that the prosecutor misspoke when he stated [Appellant's] blood was on the rock but his next statement was specific ". . . the blood was [Calabro's]."
>
> ***
>
> The [trial] court also stated on two separate occasions that opening and closing arguments are not evidence. A jury is expected to follow the instructions submitted to it and to decide what the true facts are/were in this case.

PCRA Court Opinion, 9/15/15, at 9.

Again, our review of the record supports the PCRA court's conclusions. Trial counsel therefore cannot be deemed ineffective for failing to pursue this meritless claim. **Payne**. The PCRA court correctly denied this claim.

In his third issue, Appellant asserts that trial counsel was ineffective for not presenting "evidence that another individual, who lived at the same place as the victim, confessed to a killing that same night." Appellant's Brief at 18. In rejecting this claim, the PCRA court accepted trial counsel's testimony that she discounted the possibility that this other individual was

- 11 -

the murderer because that individual, a juvenile, alleged that he had stabbed a victim; Ms. Calabro was not stabbed, but had been killed by a blunt impact to the skull. Also, trial counsel noted that a Children & Youth Services caseworker believed the juvenile's story to be a "manipulation." PCRA Court Opinion, at 9.

Given these discrepancies and credibility issues, the PCRA court correctly found that Appellant's claim lacks arguable merit. Moreover, we note that this claim of ineffectiveness involves counsel's trial strategy. The Supreme Court of Pennsylvania has repeatedly held that "a petitioner is not entitled to relief because counsel's trial strategy was unsuccessful; when the course chosen was reasonable, counsel cannot be faulted for failing to pursue a different path. Speculation by hindsight that a different strategy might possibly have been successful is not the test which establishes ineffectiveness of counsel." *Commonwealth v. Fisher*, 813 A.2d 761, 767 (Pa. 2002) (internal citation omitted). To sustain a claim of ineffectiveness predicated on strategy, a litigant must prove that the strategy employed by trial counsel "was so unreasonable that no competent lawyer would have chosen that course of conduct." *Commonwealth v. Chmiel*, 889 A.2d 501, 541 (Pa. 2005).

At the PCRA court's evidentiary hearing, trial counsel testified about why she did not use the juvenile's "confession." She described her trial strategy as instead placing blame for the murder on two different men, one of whom had a Protection from Abuse order filed against him by Ms. Calabro

and could not account for his whereabouts on the night in question. ***See*** N.T., 4/21/15, at 99, 108-09. The PCRA court credited trial counsel's testimony and found her strategy reasonable. We cannot disturb this determination. ***See Commonwealth v. Harmon***, 738 A.2d 1023, 1025 (Pa. Super. 1999) (when PCRA court's determination of credibility is supported by the record, it cannot be disturbed on appeal). Thus, the PCRA court properly denied Appellant's third issue.

In his final two issues, Appellant raises new ineffectiveness challenges against his first appointed PCRA counsel, asserting failure to raise the ineffectiveness of his trial counsel and direct appeal counsel in the 2014 supplemental petition. These claims concern limitations on trial counsel's questioning of the Commonwealth's witnesses' "questionable life style and characteristics related to reasons why they would altogether conspire to frame false testimony" against Appellant and challenges to whether the evidence was sufficient to "establish the identity of the perpetrator of the murder." Appellant's Brief at 3-4.

These allegations were not raised and presented to the PCRA court upon Appellant's successful removal of his original appointed PCRA counsel, after which Appellant proceeded *pro se* with standby counsel. Instead, they are raised for the first time on this appeal. But such claims may not be raised for the first time on appeal. ***See Commonwealth v. Henkel***, 90 A.3d 16, 21-30 (Pa. Super 2014) (*en banc*) (providing a thorough discussion

of our Supreme Court's treatment of claims of PCRA counsel's ineffectiveness raised for the first time on appeal). *Id.*[3] If they are reviewable at all, these claims must be raised in a new PCRA petition.

In summary, Appellant's claims of counsel ineffectiveness in his PCRA petition are either meritless or, because they have been inappropriately raised for the first time on appeal, are waived as to his initial round of PCRA review. We therefore affirm the PCRA court's order denying Appellant post-conviction relief.

Order affirmed. Application for remand denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/8/2016

---

[3] On January 4, 2016, Appellant filed an application for remand. He based his request on the Supreme Court of Pennsylvania's plurality decision in *Commonwealth v. Ligons*, 971 A.2d 1125 (Pa. 2009). As explained in *Henkel*, *Ligons* has been superseded by majority decisions from the Supreme Court of Pennsylvania and is no longer controlling.